LAW OFFICES OF S. CHANDLER VISHER
S. Chandler Visher (State Bar No. 52957)
44 Montgomery Street, Suite 3830
San Francisco, California 94104
Telephone: (415) 901-0500, Facsimile: (415) 901-0504
chandler@visherlaw.com

THE LAW OFFICES OF DANIEL HARRIS
Daniel Harris  *(Pro Hac Vice)*
Anthony Valach *(Pro Hac Vice)*
150 N. Wacker Drive, Suite 3000
Chicago, IL 60606
Telephone: (312) 960-1802

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| JOHN SCHLEGEL and CAROL ROBIN SCHLEGEL, on behalf of themselves and all others similarly situated,<br><br>                        Plaintiffs,<br><br>v.<br><br>WELLS FARGO BANK, N.A.,<br><br>                        Defendant. | **No. 10-cv-5679**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY DEMANDED** |

## AMENDED COMPLAINT

1.      Plaintiffs John and Carol Robin Schlegel, by their counsel, bring this action on behalf of themselves and all others similarly situated against Wells Fargo Bank, N.A. ("Wells Fargo") to challenge defendant's practice of ignoring its own loan modification agreements, resulting in violations of the federal Fair Debt Collection Practices Act and the Equal Credit Opportunity Act.  Defendant improperly threatened plaintiffs with foreclosure of their home and

even hired a foreclosure attorney for that purpose.  Only after the original complaint herein was filed did defendant relent.

## THE PARTIES

2.      Plaintiffs John and Carol Robin Schlegel own a home in Las Cruces, New Mexico.  Defendant Wells Fargo Bank, N.A. -- which is headquartered in San Francisco, California – purchased the mortgage on the Schlegels' home at a time when loan secured thereby was in default.  Wells Fargo Home Mortgage, a division of Wells Fargo Bank, N.A., services the Schlegels' mortgage. Wells Fargo Bank, N.A. owns and controls Wells Fargo Home Mortgage.  References to Wells Fargo include Wells Fargo Home Mortgage.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because plaintiffs are seeking relief under federal law, pursuant to the Fair Debt Collection Practices Act and the Equal Credit Opportunity Act.

4.      Venue is proper in this Court because defendant is headquartered in this District and does business here.28 U.S.C. § 1391(c).

## BACKGROUND

5.      The mortgage industry loan modification process is malfunctioning in a variety of ways.  One of those ways is that mortgage customers are approved for loan modifications and then told they are in default even though they have been complying with the terms of the loan modification agreement.  As Iowa Attorney General Tom Miller testified to the Senate Banking Committee on November 16, 2010:

> Perhaps the biggest problem is that loss mitigation and foreclosure exist simultaneously on parallel tracks.  This leads to problems when the left hand does not know what the right hand is doing.  Thus, we all hear stories of borrowers who thought they were approved for a loan modification receiving a notice of foreclosure sale.

6.     Plaintiffs' situation illustrates the problem.  John and Carol Robin Schlegel own a home in Las Cruces, New Mexico.  In January 2009, they obtained a $157,605 loan from NTFN, Inc. and signed a deed of trust encumbering their home to secure the loan.  Later that year, the Schlegels experienced financial difficulties and fell behind on their mortgage payments.

7.     On March 3, 2010, the Schlegels filed a Chapter 7 petition in bankruptcy.  In the included Statement of Intention the Schlegels indicated that they intended to stay in their home and reaffirm the mortgage debt.

8.     On March 22, 2010, the Schlegels' loan and deed of trust were assigned to Wells Fargo.  At the time of the assignment, the Schlegels were delinquent on their loan payments and in default under the loan agreement.

9.     On March 27, 2010,  Wells Fargo sent the Schlegels a letter proposing a loan modification.  The proposed modification, to be effective May 1, kept the same interest rate but extended the maturity date of the loan from February 2039 to April 1, 2050.  The letter enclosed a loan modification agreement dated March 26.  The modification had been approved by Freddie Mac on March 26.   The cover letter also told the Schlegels that the approval was contingent on bankruptcy court consent or release of the bankruptcy case.

10.     On April 6 Wells Fargo wrote the Schlegels again, telling them that the "Loan Modification is contingent on receiving consent from the bankruptcy court" and that "Once the appropriate consent is received, Wells Fargo Home Mortgage will proceed with issuing the Loan Modification documents to you."

11.     On April 6, 2010, the Schlegels filed a copy of the March 27 letter from Wells Fargo in the bankruptcy court as an exhibit to a Petition to Gain Consent to Modify First Mortgage.  Wells Fargo had requested notice of bankruptcy filings and received a copy of this document.

12.      Satisfied that the bankruptcy condition had been met, on June 29, 2010 Wells Fargo sent the Schlegels a new loan modification agreement effective July 1 which recited that the Schlegels had obtained necessary bankruptcy court consent "or equivalent" on April 6, 2010.  The cover letter with the agreement began: "This letter will confirm our formal approval of a

loan modification of your mortgage loan." Payments were to commence on August 1, 2010. The loan modification was approved by Freddie Mac on June 29.

13.     The June 29 loan modification agreement was signed by the Schlegels on July 2 and by Wells Fargo, per Nedi B. Gulo, VP of Loan Documentation, on July 7. The fully executed June 29 loan modification agreement is attached hereto as Exhibit A.

14.     The Schlegel bankruptcy discharge order was filed on July 9, 2010. Wells Fargo received a copy of the discharge on July 19, 2010. The bankruptcy case was closed on August 23, 2010.

15.     In apparent contravention of the modification agreement, on July 19, 2010, Wells Fargo sent a default notice to the Schlegels which began:

> Our records indicate that your loan is in default for failure to make payments due. Unless the payments on your loan can be brought current by August 18, 2010, it will become necessary to require immediate payment in full (also called acceleration) of your Mortgage Note and pursue the remedies provided for in your Mortgage or Deed of Trust, which include foreclosure.

16.     This letter demanded payment of $4,233.20. On the date this demand letter was sent the June 29 loan modification was fully effective and no payment thereon was due until August 1, 2010. The Schlegels received the July 19 default notice letter on or about July 23, 2010 and called Wells Fargo to inquire. Wells Fargo told them not to worry, to sit tight and to proceed with the loan modification. Accordingly, the Schlegels made the monthly payments required under the modification agreement of $1,052.57 beginning on August 1, 2010 and have continued thereafter making the monthly payments required by the June 29 loan modification.

17.     Despite the execution of the June 29 loan modification agreement and the assurance that the September 19 default notice was sent in error and that the matter would be corrected Wells Fargo did not adjust its records to reflect the new principal balance in the modification agreement, nor were the Schlegels' payments for August, September or October, and perhaps even thereafter, credited against principal or interest. Rather, the Schlegels' payments were kept in a suspense account.

18.     On November 13, 2010, the Schlegels received a second post-modification default notice from Wells Fargo, dated November 7, 2010, which stated: "Our records show that your mortgage is in default."  The November 7 noticve claimed that the Schlegels had past due payments of $11,256.36, plus a fee of $15.00, and had unapplied funds of $5,217.59, leaving a balance due of $6,053.77.  The letter warned the Schlegels:

> To avoid the possibility of acceleration, you must pay this amount plus any additional monthly payments, late charges and other charges that may be due under applicable law after the date of this notice and on or before December 7, 2010 in CERTIFIED funds, to **Wells Fargo Home Mortgage, 1200 W 7th Street, Suite L2-200, Los Angeles, CA 90017**
>
> If funds are not received by the above referenced date, we will proceed with acceleration. Once acceleration has occurred, we may take steps to terminate your ownership in the property by a foreclosure proceeding or other action to seize the home or pursue any other remedy permitted under the term of your Mortgage.

19.     Wells Fargo's November 7 default notice contained a warning, consistent with requirements of the federal Fair Debt Collection Practices Act ("FDCPA"), stating: "This communication is an attempt to collect a debt and any information obtained will be used for that purpose."

20.     The Schlegels telephoned Wells Fargo the day they received the November 7 default notice to complain that the notice was in error because payments on the loan modification were up to date, but Wells Fargo took the position that there was no modification agreement in effect and that the Schlegels were in default.

21.     After the November 13 telephone conversation, in which the Schlegels had explained to Wells Fargo for the second time that a loan modification was in effect and was not in default, the Schlegels received a third post-modification default notice from Wells Fargo dated November 14, 2010, which again claimed they were in default but demanded a different amount due -- $5,630.26.

22.     The November 14 default letter said, in pertinent part:

> Our records show that your mortgage is in default.  . . . .  The past due payments on this loan are to be made by December 14, 2010, or it will become necessary for us to

accelerate the Mortgage Note and pursue the remedies against the property as provided for in the Mortgage or Deed of Trust.

23.     The November 14 default notice also contained an FDCPA warning: "This communication is an attempt to collect a debt and any information obtained will be used for that purpose."

24.     In a third attempt to get Wells Fargo to acknowledge the loan modification, on December 3 the Schlegels sent Wells Fargo a request for information as to why it was sending default notices and ignoring the loan modification, which was received by Wells Fargo on December 7.

25.     On December 20, 2010, almost five months after the July 23 phone call in which the Schlegels first told Wells Fargo it was sending default notices in error, more than a month after the phone call the Schlegels made to Wells Fargo on November 13 reminding it of the loan modification agreement, almost two weeks after Wells Fargo had received the December 3 letter and four days after Wells Fargo was served with the complaint herein, Wells Fargo sent the Schlegels a fourth default notice in which it made good on its earlier threat to accelerate the loan, stating:

> The above loan file has been referred to our attorney with instructions to begin foreclosure proceedings.
> You are hereby notified that, due to the default under the terms of the mortgage or deed of trust, the entire balance is due and payable.

26.     This December 20 fourth default notice also contained an FDCPA warning: "This communication is an attempt to collect a debt and any information obtained will be used for that purpose."

27.     Even later, on December 22, 2010, Wells Fargo (through one of its law firms, Castle Stawaiarski, LLC in Albuquerque, New Mexico) sent the Schlegels the fifth default notice since the loan modification became effect, titled "RE: Notice of Default and Acceleration" which said:

> If you do not bring your account current on or before **January 24, 2011, Wells Fargo Home Mortgage**, may file an action for the money due or take steps to terminate your ownership in the real property by requiring payment in full of the loan and commencing a foreclosure proceeding or other action to foreclose the mortgage.

6

28.     Meanwhile, on December 14, 2010, the Schlegels filed this action (served on December 16).  After sending the December 22 acceleration notice Wells Fargo relented and acknowledged that the modification had been in effect since July 1.

29.     The five post-modification default notices from Wells Fargo to the Schlegels and its refusal to acknowledge the loan modification caused the Schlegels mental anguish.  Wells Fargo's actions in regard to the mortgage of their home have had an especially profound influence on Mr. Schlegel, who suffers from post traumatic stress disorder (PTSD).  Wells Fargo's actions have worsened the effects of PTSD by creating an almost constant and severe stress.  The demands from Wells Fargo and thinking about what will happen if Wells Fargo forecloses on his home has caused Mr. Schlegel to have frequent panic attacks, and it is almost impossible for him not to think of these consequences throughout the day.  The result is that he does not feel secure in his own home.  Wells Fargo's conduct has also caused Mr. Schlegel frequent depression, has made him feel powerless to affect the outcome no matter what he does to comply with Wells Fargo's requests, is almost too much for him to bear, and is totally frustrating.  To deal with the anxiety attacks Mr. Schlegel requested his doctors to double his daytime medication.  Mr. Schlegel also has to take medication to let him sleep, but sometimes his sleep does not last through the night.  Both of the Schlegels regularly wake in the night with thoughts of the uncertain future of their home and finances.  Mr. Schlegel finds it difficult to sleep without prescription medications.

30.     The Schlegels' situation illustrates the general problem described by Iowa Attorney General Tom Miller, i.e., that for many mortgage servicers "the left hand does not know what the right hand is doing."  Wells Fargo often ignores its loan modification agreements and sends erroneous default notices and demand letters to borrowers who are in compliance with their loan modification agreements.  Upon information and belief, foreclosure actions are actually filed against some borrowers, as may well have happened to the Schlegels had they not filed suit in this Court.

31.     Wells Fargo's failure here is violative of federal law, as explained further below, even if the bank is merely negligent.  But the failure goes beyond negligence.  It is reckless.

Wells Fargo has been repeatedly admonished and sanctioned for ignoring loan modification contracts or court orders.

32.     For example, in July 2008 in *Wells Fargo Bank, N.A. v. Jones*, 391 B.R. 577 (E.D. La. 2008), a federal court in Louisiana affirmed a bankruptcy court order finding Wells Fargo in violation of the debtor's confirmed plan, and imposing punitive damages, noting:

> The Bankruptcy Court clearly had authority to impose punitive damages against Wells Fargo pursuant to Section 362 because the Bankruptcy Court determined that Wells Fargo's conduct was "egregious."
> *Id.* at 609.

33.     In February 2009, a federal bankruptcy court in Florida sanctioned Wells Fargo for violation of a discharge injunction, stating:

> The Court finds that Wells Fargo's actions were both intentional and egregious.  Wells Fargo charged improper fees during the life of the Chapter 13 case. Wells Fargo attempted to collect those improper fees after Plaintiffs received their discharge by making numerous telephone calls and sending numerous ominous letters to Plaintiffs demanding that Plaintiffs become current or face foreclosure.  Wells Fargo ignored two letters sent by Plaintiffs' counsel attempting to resolve the matter.  Wells Fargo made false entries on Plaintiffs' credit reports.  Wells Fargo overcharged Plaintiffs when Plaintiffs' house was sold.  Finally, Wells Fargo completely ignored the complaint in this adversary proceeding, opting not to file an answer or to become otherwise involved until after the entry of a default.  The Court finds that Wells Fargo's conduct warrants an award of punitive damages in the amount of $15,000.
> *Id.* at 122.

34.     In May 2010, in a case filed by Wells Fargo mortgage customers Ron and Marianna Ward, published reports indicate Judge Jeff Almquist in Santa Cruz County, California issued a temporary injunction against Wells Fargo based on allegations that Wells Fargo sold the Wards' home in foreclosure even though the borrowers were complying with a loan modification agreement.

35.     Also in May 2010, a federal bankruptcy judge in Houston, Texas sanctioned Wells Fargo for repeatedly ignoring an Agreed Judgment modifying a mortgage.  In commenting on the testimony of a Wells Fargo witness, a Senior Counsel for the company, the court said:

> The Court finds Grissom's credibility to be lacking in certain respects.  First, he gave a Shermanesque statement that Wells Fargo was now in compliance with the Agreed Judgment . . ., but then subsequently had to admit that Wells Fargo's records still

contained errors in violation of the Agreed Judgment. . . . Second, he could not explain why there are late charges appearing on Wells Fargo's records. . . . Grissom's failure on these key points, combined with his nonchalance on the stand, reflects a troubling lack of perspective regarding how much is at stake for honest and diligent Chapter 13 debtors, such as the De La Fuentes, who are trying to hold on to their home, and how important it is for Wells Fargo to abide by this Court's orders when dealing with debtors. Grissom appears to be representative of the absence of any sense of urgency within Wells Fargo to maintain accurate records and comply with the law.

*In Re De La Fuente*, 430 B.R. 764, 783-84  (Bkrtcy. S.D. Texas 2010).

36.     In going on to reject Wells Fargo's "mistakes happen" defense, the bankruptcy court noted:

The Court certainly agrees that "mistakes happen."  However, when mistakes happen not once, not twice, but repeatedly, and when actions are not taken to correct these mistakes within a reasonable period of time, the failure to right the wrong - particularly when the basis for the problem is a months-long violation of an agreed judgment - the excuse of "mistakes happen" has no credence.  Here, Wells Fargo's failure to take corrective action to comply with the Agreed Judgment does not come within hailing distance of the realm where "mistakes happen" is a legitimate excuse.  Rather, such failure, if not willful refusal to comply with the Agreed Judgment, is at least reckless disregard of the Agreed Judgment.

*In Re De La Fuente*, 430 B.R. 764, 790-91  (Bkrtcy. S.D. Texas 2010).

37.     In November 2010, a judge in Suffolk County, New York, in the case *Wells Fargo Bank NA v. Meyers*, 34632-09, dismissed a foreclosure action filed by Wells Fargo because Wells Fargo had acted in bad faith by commencing the action one day after the homeowners accepted a loan modification proposal by Wells Fargo.

**COUNT I -- FAIR DEBT COLLECTION PRACTICES ACT**

38.     Plaintiffs reallege and incorporate the above paragraphs one through 37 as though fully set forth herein.

39.     Plaintiffs are consumers within the meaning of the FDCPA.  In July through December of 2010, Wells Fargo was acting as a debt collector with respect to the Schlegels' home loan.  Wells Fargo is in the business of collecting debts and uses instrumentalities of interstate commerce in that business.  *See Oppong v. First Union Mortg. Corp.*, 215 Fed.Appx. 114, 119  (3rd Cir. 2007) ("the District Court was correct to conclude that Wells Fargo is a debt

collector under the FDCPA" . . . "in a typical eighteen-month period, it appears that Wells Fargo acquires 534 mortgages in default").

40.     The Schlegels' home loan was in default at the time it was assigned to Wells Fargo on March 22, 2010.  Wells Fargo was not attempting to collect the debt in the period of July through December 2010 as a creditor.  The definition of creditor provided by 15 U.S.C. § 1692(a)(4) "does not include any person to the extent that he receives an assignment or transfer of a debt in default."  The FDCPA uses the status of the debt at the time of assignment to distinguish between a debt collector and a creditor, treating assignees as debt collectors if the debt sought to be collected was in default at the time of the assignment.  Wells Fargo acted as a debt collector during this period.  Wells Fargo may not use the exception to the debt collector definition in 15 U.S.C. § 1692a(6)(A) for "any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor."

41.     Wells Fargo's notices of November 7, 2010, November 14, 2010 and December 20, 2010 also contain language debt collectors are required to include pursuant to the FDCPA, an apparent acknowledgement that Wells Fargo was subject to the FDCPA with respect to the Schlegels' loan.

42.     Wells Fargo violated the FDCPA, 15 U.S.C. § 1692e by making false, deceptive or misleading representations in connection with attempts to collect the Schlegels' debt and alleged debt.  Those false, deceptive or misleading representations included the Wells Fargo letters of November 7, 2010, November 14, 2010, and December 20, 2010, and the letter sent to the Schlegels by Wells Fargo through its attorneys on December 22, 2010.  The letters misrepresented the legal status of the debt, by saying it was in default when it was not, and misrepresented the amounts of money then immediately due and owing.

43.     Wells Fargo violated the FDCPA,15 U.S.C. § 1692f  by using unfair or unconscionable means to collect or attempt to collect a debt; namely, by making demands in the Wells Fargo letters of November 7, 2010, November 14, 2010, and December 20, 2010, and in its foreclosure counsel's letter of December 22, 2010 that were inconsistent with the loan modification agreement.

44.     Plaintiffs suffered actual damages, including mental anguish, as a result of Wells Fargo's violations of the law and are entitled to their actual and statutory damages, pursuant to 15 U.S.C. § 1692(k).

45.     Plaintiffs bring this FDCPA claim on behalf of themselves and a statutory damage class of similarly situated mortgage customers.  More specifically, with respect to Count One of the Amended Complaint, plaintiffs seek certification of a Class consisting of all persons who (a) have a home mortgage loan that was assigned by a lender to Wells Fargo at a time when it was in default, i.e., when a mortgage payment on the loan was more than 30 days overdue and no forbearance agreement was in effect; (b) entered into a final loan modification agreement with Wells Fargo with respect to that home mortgage loan after the assignment; (c) and to whom Wells Fargo sent a notice of default (1) on or after December 14, 2009 and (2) after the loan modification agreement was executed by Wells Fargo; (d) which notice ignored the terms of the loan modification.  Plaintiffs reserve the right to amend this proposed class definition based on discovery to ensure that the class members are readily ascertainable based on objective criteria.

46.     Upon information and belief, the members of the Class are so numerous that joinder is impractical.  Upon information and belief, the Class is comprised of hundreds of individuals.  Fed.R.Civ.P. 23 (a)(1).

47.     There are questions of law and fact common to the members of the Class, which questions predominate over any individual issues. Fed.R.Civ.P. 23 (a)(2).  These common questions include:

>      a.   whether defendant is subject to the Fair Debt Collection Practices Act with respect to mortgage loans that it acquired while the loans were in default;
>
>      b.   whether defendant Wells Fargo violated the Fair Debt Collection Practices Act by sending default notices to proposed class members when those mortgage customers who were in compliance with their loan modification agreements; and
>
>      c.   the appropriate amount of class-wide statutory damages.

48.     The claims of plaintiffs are typical of the claims of all members of the Class. Fed.R.Civ.P. 23 (a)(3).

49.     Plaintiffs will fairly and adequately represent the Class.  Plaintiffs are members of the Class.  Plaintiffs are willing and able to serve as representatives of the Class and have no knowledge of any possible divergent interests between themselves and any member of the Class. Plaintiffs have retained competent counsel experienced in class actions and complex litigation to provide representation on behalf of themselves and the Class. Fed.R.Civ.P. 23(a)(4).

50.     Questions of law and fact common to members of the Class predominate over any questions affecting individual members.  The determinative facts, laws and legal principles apply universally to plaintiffs and the members of the Class.  Fed.R.Civ.P. 23 (b)(3).

51.     Plaintiffs and the members of the Class all have valid claims against defendant. Each element of each claim is susceptible of common proof.

52.     A class action provides a fair, efficient and superior method for the adjudication of this controversy.

53.     The claims of the individual Class members are small in relation to the expenses of litigation, making a class action the only procedure by which Class members can, as a practical matter, redress their grievances.  If Class members sought relief individually, legal fees would dwarf recoveries for every Class member.  However, the total amount of the claims of individual Class members is large enough to justify the expense and effort in maintaining a class action.

## COUNT TWO -- EQUAL CREDIT OPPORTUNITY ACT

54.     Plaintiffs reallege and incorporate the above paragraphs one through 37 and 38 through 40 as though fully set forth herein.

55.     Federal law contains additional safeguards that are supposed to prevent what happened to the Schlegels from occurring.  One safeguard is the notice provisions of the Equal Credit Opportunity Act.

56.     Originally enacted in 1974 to prohibit discrimination in credit transactions, the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq., was amended in 1976 to require

creditors to furnish written notice of the specific reasons for adverse action taken against an applicant for credit.

57.     More specifically, the statute provides:

Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor.  A creditor satisfies this obligation by -

(a.)     providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken; or

(b.)     giving written notification of adverse action which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of a person or office from which such statements may be obtained.  Such statement may be given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request.

15 U.S.C. § 1691(d)(2).

A statement of reasons meets the requirements of this section only if it contains the specific reasons for the adverse action taken.

15 U.S.C. § 1691(d)(3).

58.     The ECOA defines "adverse action," stating:

For purposes of this subsection, the term "adverse action" means a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested.  Such term does not include a refusal to extend additional credit under an existing credit arrangement where the applicant is delinquent or otherwise in default, or where such additional credit would exceed a previously established credit limit.

15 U.S.C. § 1691(d)(6)  .

59.     The ECOA defines "applicant" and "credit" as follows:

The term "applicant" means any person who applies to a creditor directly for an extension, renewal, or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit.

15 U.S.C. § 1691a(b).

The term "credit" means the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its payment or to purchase property or services and defer payment therefore.

15 U.S.C. § 1691a(d).

60.     The ECOA expressly authorizes private law suits to enforce the statutory requirements. The statute provides: "Any creditor who fails to comply with any requirement imposed under this title shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class."15 U.S.C. § 1691e(a).  "Any creditor . . . who fails to comply with any requirement imposed under this title shall be liable to the aggrieved applicant for punitive damages in an amount not greater than $10,000, in addition to any actual damages provided in subsection (a), except that in the case of a class action the total recovery under this subsection shall not exceed the lesser of $500,000 or 1 percent of the net worth of the creditor.  In determining the amount of such damages in any action, the court shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional."  15 U.S.C. § 1691e(b).  "Upon application by an aggrieved applicant, the appropriate United States district court . . . may grant such equitable and declaratory relief as is necessary to enforce the requirements imposed under this title." 15 U.S.C. § 1691e(c). "In the case of any successful action under subsection (a), (b), or (c), the costs of the action, together with a reasonable attorney's fee as determined by the court, shall be added to any award of damages awarded by the court under such subsection."15 U.S.C. § 1691e(d).

61.     Wells Fargo was a creditor within the meaning of the ECOA.  The Schlegels were applicants for credit within the meaning of the ECOA.  They applied to Wells Fargo for an extension, renewal, or continuation of credit; i.e. the right to defer payment of debt.

62.     From July 7, 2010 when Wells Fargo executed the loan modification nothing further was required to implement the modification and Wells Fargo should have recognized and implemented the modification from and after that date.  However, from July 7 through late

December 2010 Wells Fargo treated the modification as if it did not exist.  Banks show their intent through their conduct – here the conduct, five default notices to the Schlegels, acceleration of their loan and referral for foreclosure, denied the existence of the modification.  The failure to recognize the modification may have been the result of incompetence and negligence, but Wells Fargo was given ample opportunity to correct its error and, instead, persisted in proceeding down the path of default, acceleration and foreclosure.  The fact that Wells Fargo finally acknowledged the existence of the modification some weeks after this suit was filed does not change the adverse character of its conduct before that time.

63.   The bank's conduct of treating the Schlegels as if they were in default even though they were not and accelerating their loan to claim it was all immediately due and payable amounted to a denial or revocation of credit, a change in the terms of an existing credit arrangement, or a refusal to grant credit in substantially the amount or on substantially the terms requested, within the meaning of the ECOA.

64.   Wells Fargo's failure to capitalize the Schlegels' delinquent payments during the July through November 2010 time period, as promised in the loan modification agreement, also constituted an adverse action within the meaning of the ECOA.  Capitalization of the delinquent payments, as promised in the loan modification agreement, was a form of credit, i.e. the right to defer payment of a debt.  The bank's failure to carry through on its promise to capitalize the delinquent payments amounted to a denial or revocation of credit within the meaning of the ECOA.

65.   Wells Fargo's failure to credit the Schlegels' monthly mortgage payments against their principal and interest obligations during the July through November 2010 period also constituted an adverse action within the meaning of the ECOA.  An implicit term of the loan modification agreement was that the Schlegels' payments would be credited against their loan obligations.  Failure to carry through on that implicit promise amounted to an adverse change in the terms of an existing credit arrangement.

66. Wells Fargo's decision to tell the Schlegels that they were in default, when the Schlegels really were not in default, constituted an adverse action within the meaning of the ECOA.

67. Wells Fargo's November 7, 2010 letter demanded that the Schlegels pay $6,053.77 within 30 days. This demand constituted an adverse action within the meaning of the ECOA because the loan modification agreement gave the Schlegels the right to defer payment of this amount as long as they complied with the loan modification agreement. Wells Fargo's demand for payment within 30 days of a debt that Wells Fargo had agreed to defer also constituted an adverse change in an existing credit arrangement.

68. Similarly, Wells Fargo's demand for $5,630.26 in its letter of November 14, 2010 constituted an adverse action within the meaning of the ECOA.

69. Wells Fargo's decision to refer the Schlegels to the bank's foreclosure counsel "with instructions to begin foreclosure proceedings" as communicated in its letter of December 20, 2010 constituted an adverse action within the meaning of the ECOA.

70. Under the loan modification agreement, the Schlegels had the right to avoid foreclosure as long as they complied with the loan modification agreement. Referring the Schlegels to foreclosure counsel constituted an adverse change in an existing credit arrangement.

71. Wells Fargo's decision to accelerate the loan and declare "the entire balance . . . due and payable" as communicated to the Schlegels in Wells Fargo's letter of December 20, 2010 constituted an adverse action within the meaning of the ECOA. The loan modification agreement gave the Schlegels the right to defer payment of that amount as long as they complied with the loan modification agreement. That right to defer payment of a debt constituted credit within the meaning of the ECOA. Wells Fargo's demand for immediate payment of a debt that Wells Fargo had agreed to defer constituted a denial or revocation of credit within the meaning of the ECOA. It also constituted an adverse change in an existing credit arrangement. The fact that Wells Fargo later rescinded the acceleration does not change the clear adverse nature of the action at the time it was taken.

72.     For purposes of triggering the bank's duties under the ECOA, it does not matter whether Wells Fargo's failures and actions set forth above were simply the product of a mistake on the part of the bank.  Adverse actions within the meaning of the ECOA include mistaken adverse actions.  Indeed, one of the purposes of the notice provisions of the ECOA is to give the credit applicant a chance to rectify mistakes in the event that the creditor is acting on the basis of misinformation or inadequate information.

73.     The letters that Wells Fargo sent to the Schlegels on November 7, November 14, December 20 and December 22, 2010, did not contain the information needed to meet the statutory requirements of an adverse action notice.

74.     Wells Fargo's failure to comply with the ECOA was reckless, entitling plaintiffs and those similarly situated to punitive damages as provided for by the ECOA.  Wells Fargo's failure to comply with the ECOA was part and parcel of its general practice of ignoring its own loan modification agreements -- a practice for which the bank has been repeatedly admonished by the courts.  Moreover, it is reckless for a bank of Wells Fargo's sophistication to ignore its own agreements and the laws that it is obliged to follow, especially after repeated alerts from the borrower that a loan modification was in effect.

75.     In any event, Wells Fargo is liable for actual damages (including mental anguish) caused by its misconduct.  Moreover, the bank should be required to implement procedures to ensure its compliance with the law.

76.     Because plaintiffs believe that they are typical of a much larger pattern of wrongdoing, this claim is being brought as a class action pursuant to Fed.R.Civ.P. 23.

77.     The acts, practices and conduct of which plaintiffs complain affect an injunctive and punitive damage Class consisting of all persons who (a) have a home mortgage loan owned or serviced by Wells Fargo; (b) have a final loan modification agreement signed by the borrower and Wells Fargo with respect to that home mortgage loan and; (c) to whom Wells Fargo sent a notice of default or acceleration notice after the date of the first payment required under the modification and on or after December 14, 2008 based on the loan terms or loan condition without consideration of the modification.  Plaintiffs reserve the right to amend this proposed

class definition based on discovery to ensure that the class members are readily ascertainable based on objective criteria.

78.   The acts, practices and conduct of which plaintiffs complain affect an actual damages subclass of the above defined class consisting of loan modification recipients (a) for which modification Wells Fargo has no record that the loan as modified was in default and; (b) who suffered actual damage as a result of the adverse action.

79.   Upon information and belief, the members of the Class are so numerous that joinder is impractical.  Upon information and belief, the Class is comprised of hundreds of individuals.  Fed.R.Civ.P. 23 (a)(1).

80.   There are questions of law and fact common to the members of the Class, which questions predominate over any individual issues. Fed.R.Civ.P. 23(a)(2). These common questions include:

    a.   whether Wells Fargo violated the Equal Credit Opportunity Act when it sent notices of default or acceleration to customers who were in compliance with their loan modification agreements and did not provide adverse action notices within thirty days thereafter and;

    b.   the appropriate class-wide equitable relief and the appropriate amount of class-wide statutory damages.

81.   The claims of plaintiffs are typical of the claims of all members of the Class. Fed.R.Civ.P. 23 (a)(3).

82.   Plaintiffs will fairly and adequately represent the Class.  Plaintiffs are members of the Class.  Plaintiffs are willing and able to serve as representatives of the Class and have no knowledge of any possible divergent interests between themselves and any member of the Class. Plaintiffs have retained competent counsel experienced in class actions and complex litigation to provide representation on behalf of themselves and the Class.  Fed.R.Civ.P. 23(a)(4).

83.   Questions of law and fact common to members of the Class predominate over any questions affecting individual members.  The determinative facts, laws and legal principles apply universally to plaintiffs and the members of the Class.  Fed.R.Civ.P. 23  (b)(3).

84.   Plaintiffs and the members of the Class all have valid claims against defendant. Each element of each claim is susceptible of common proof.

85.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendant.  Fed.R.Civ.P. 23 (b)(1)(A).

86.     The prosecution of separate actions would also create a substantial risk of adjudications with respect to individual members of the Class, which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Fed.R.Civ.P. 23 (b)(1)(B).

87.     Wells Fargo has both acted and refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

88.     A class action provides a fair and efficient method for the adjudication of this controversy.

89.     The claims of the individual Class members are small in relation to the expenses of litigation, making a class action the only procedure by which Class members can, as a practical matter, redress their grievances.  If individual Class members sought relief individually, legal fees would dwarf recoveries for every Class member.  However, the total amount of the claims of individual Class members is large enough to justify the expense and effort in maintaining a class action.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment including:

1.     An order that this action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and appointing plaintiffs as class representatives, and appointing the undersigned as class counsel;

2.     An award of actual damages plus $1,000 for each named plaintiff and $500,000 in statutory damages to the class, and all the costs of this suit, including attorney's fees and costs, as a partial remedy for defendant's violation of the FDCPA.

3.     An award of $500,000 in statutory punitive damages and all the costs of this suit, including attorney's fees and costs, for the injunctive and punitive damages class as a partial remedy for defendant's violation of the Equal Credit Opportunity Act.

4.  An award of actual damages to plaintiffs and the actual damages subclass pursuant to the Equal Credit Opportunity Act.

5.     An order requiring Wells Fargo not to send, at any time more than 30 days after the effective date of a loan modification it has entered into, notices of default or notices of other adverse action towards borrowers with respect to the loan number subject to the modification unless such notices or other action are taken specifically with respect to the loan as modified based on the payment status of the loan as modified.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

6.      Such other and further relief as this Court may deem proper.

Respectfully submitted,

/s/ S. Chandler Visher_____

S. CHANDLER VISHER, ESQ.


**THE LAW OFFICES OF S. CHANDLER VISHER**
S. Chandler Visher
44 Montgomery St. Suite 3830
San Francisco, California 94104
Telephone (415) 901-0500


**THE LAW OFFICES OF DANIEL HARRIS**
Daniel Harris (pro hac vice)
Anthony Valach (pro hac vice)
150 N. Wacker Drive, Suite 3000
Chicago, IL 60606
Telephone: (312) 960-1802

Counsel for plaintiffs

21



**Wells Fargo Home Mortgage**
MAC X7801-03K
3476 Stateview Boulevard·
Fort Mill, SC 29715

MODIFICATION AGREEMENT
LOAN NUMBER 708-0211429808
PROPERTY ADDRESS 6525 Jaeger Place
Las Cruces NM 88012

Borrower's Representations

THIS LOAN MODIFICATION AGREEMENT made on June 29, 2010, by and
between John J Schlegel and Carol Robin Schlegel
(the "Borrower(s)") and Wells Fargo Bank, N A (the "Lender")
amends and supplements that certain Note and Mortgage or Deed of Trust
dated 01/06/09.
WHEREAS, Borrower has requested, and Lender has agreed, to modify
the terms of the Note and Security Instrument as follows:

1. Borrower filed for relief under Chapter 7 of the United States
   Bankruptcy Code on 03-03-10.
2. At the Borrowers request, the borrower and counsel for both parties
   agree to address the defaulted amount by means of a loan
   modification.
3. Borrower received the consent of the United States Bankruptcy Court
   or equivalent, to modify the mortgage on 4/6/2010, copy of which
   will be attached to the agreement, Borrower received or will receive
   a discharge of debt pursuant to the United States Bankruptcy Code
   on or about 4/6/2010.
4. Prior to filing for relief under the United States Bankruptcy Code,
   Borrower agreed to repay the above referenced loan pursuant to the
   Note and Security Instrument between Lender and Borrower.  Such
   agreement granted Lender a valid security interest and an
   enforceable lien on the property securing the loan.
5. Borrower, during the course of the bankruptcy case referenced above,
   did not, and does not intend to reaffirm the debt.
6. Borrower desires to retain the Property securing the Note, and
   acknowledges that Lender's security interest and lien are still
   valid and enforceable.
7. Borrower acknowledges and understands that he/she is not obligated
   to enter into this Agreement, and that he/she is entering into this
   Agreement at Borrower's request, voluntarily and with no coercion or
   pressure from Lender, for the sole purpose of retaining the Property.
   Borrower understands that he/she has no personal obligation to repay
   the debt secured by the Property if said debt is discharged in
   bankruptcy without a valid reaffirmation agreement.
   (AFTER READING THIS PARAGRAPH, BORROWER MUST INITIAL HERE.)

Lender's Representations

8. Lender acknowledges (1) that Borrower may have received a discharge
   in bankruptcy or already has received a discharge in Bankruptcy,
   (2) that the debt from the Borrower to Lender may be discharged and
   (3) that Borrower may have no personal obligation to pay the debt
   secured by the Property.
9. Lender, despite such discharge, retains a valid and enforceable
   security interest in and lien on the Property.  BK010/QS0/1

Wells Fargo Home Mortgage
is a division of Wells Fargo Bank, N.A.

WFB/Schlegel 0071



**Wells Fargo Home Mortgage·**
MAC X7801-03K
3476 Stateview Boulevard
Fort Mill, SC 29715

Page 2 - Modification Agreement   0211429808

10. Borrower desires to retain the Property securing this debt, and
Lender has agreed to such request, in exchange for payment to Lender
of the debt secured by the Property in the manner specified herein.
Therefore, in consideration of the mutual representations and the
other consideration expressed herein, Borrower and Lender jointly
agree as follows:

1. Borrower desires to retain, and Lender agrees to allow Borrower to
   retain the Property under the conditions in this Agreement.
2. Borrower and Lender agree that the consideration for this Agreement
   is Lender's forbearance from presently exercising its rights and
   pursuing its remedies under the Security Instrument as a result
   of the Borrower's default of its obligations thereunder.
3. Borrower and Lender acknowledge and agree that this Modification
   Agreement does not affect the discharge of the Borrower's personal
   liability on the debt.
4. Borrower acknowledges that the Lender has incurred, paid, or
   otherwise advanced taxes, insurance premiums, and other expenses
   necessary to protect or enforce its security interest in the Note and
   Security Instrument, and that such costs and expenses, together with
   accrued interest, in the total amount of $3,904.12 have been added
   to the indebtedness under the terms of the Note and Security
   Instrument, and that as of 07/01/10, the amount, including the
   amounts which have been added to the indebtedness, payable under the
   Note and Security Instrument (the "Unpaid Principal Balance") is
   U.S. $159,476.37.
5. Borrower shall pay the Modified Unpaid Principal Balance, plus
   interest, to the order of the Lender.  Interest will be charged
   on the unpaid principal balance at the yearly rate of 5.25%,
   beginning 07/01/10.  The Borrower shall make monthly payments of
   principal and interest of U.S. $795.58 (not including escrow
   deposit), beginning on 08/01/10 and continuing thereafter on
   the same day of each succeeding month until Lender has received
   all principal and interest payable under the Note and Security
   Instrument.  If on 07/01/50 (the "Modified Maturity Date"), there are
   still amounts due and owing under the Note and Security Instrument,
   as amended by this Modification, the Borrower will pay these
   amounts on the Modified Maturity Date.  The Borrower will make such
   payments at Lender or at such other place as the Lender may require.
6. Notwithstanding any monthly payments hereunder, Borrower
   understands that (1) Lender's sole recourse is the enforcement of
   its security interest in the Property and any action which may
   exist in relation to the Property itself and that (2) nothing in
   this Agreement revives or purports to revive any debt, or create
   any personal liability or obligation for a debt, that was discharged
   in bankruptcy. ~~~~~~ (BORROWER MUST INITIAL HERE.)

                                        BK010/QS0/2

Wells Fargo Home Mortgage
is a division of Wells Fargo Bank, N.A.

**WFB/Schlegel 0073**



**Wells Fargo Home Mortgage**
MAC X7801-03K
3476 Stateview Boulevard
Fort Mill, SC 29715

Page 3 - Modification Agreement   0211429808

7. Notwithstanding any other covenant, agreement or provision of the Note and Security Instrument, as defined in the Modification Agreement, the Borrower(s) agree as follows:

If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate possession of the Property secured by the Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal and or bankruptcy law as of the date of this Modification Agreement. If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must cure this default pursuant to the terms of the Security Instrument. If Borrower fails to cure the default prior to the expiration of this period, Lender may invoke any remedies permitted by the Security Instrument without further notice or demand on Borrower. Lender's rights and remedies extend only to the Property, and any action related to the Property itself and not to recovery of any amount owed to Lender under the Note which has been discharged in bankruptcy.

8. Borrower also will comply with all other covenants, agreements, and requirements of the Security Instrument, included without limitation, the Borrower's covenants and agreements to make all payments of taxes, insurance premiums, assessments, escrow items, impounds, and all other payments that are required by the Security Instrument; however, the following terms and provisions are forever canceled, null and void, as of the effective date of this Modification Agreement:
   (a) All terms and provisions of the Note and Security Instrument (if any) providing for, implementing, or relating to, any change or adjustment in the rate of interest payable under the Note; and
   (b) All terms and provisions of any adjustable rate rider or other instrument or document that is affixed to, wholly or partially incorporated into, or is part of, the Note or Security Instrument and that contains any such terms and provisions as those referred to in (a) above.
   (c) All terms and provisions of the Note and Security Instrument that provide that Borrower is personally liable to pay the debt secured by the Property, if a Discharge is received in the bankruptcy case.

Wells Fargo Home Mortgage
is a division of Wells Fargo Bank, N.A.

WFB/Schlegel 0075



**Wells Fargo Home Mortgage**
MAC X7801-03K
3476 Stateview Boulevard
Fort Mill, SC 29715

Page 4 - Modification Agreement  0211429808

9.  If Borrower fails to pay Lender the amount due and owing or to pay
    any monthly payment on the dates above, Borrower shall surrender
    the Property to Lender.  If Borrower fails or refuses to surrender
    the Property to Lender, Lender may exercise any and all remedies
    to recover the Property as may be available to Lender pursuant
    to its security interest and lien and applicable law. . These
    remedies may include the recovery of reasonable attorney's fees
    actually incurred, plus legal expenses and expenses for entering
    on the Property to make repairs in any foreclosure action filed to
    enforce the Lender lien.  Lender's rights and remedies extend only
    to the Property, and any action related to the Property itself
    and not to recovery of any amount owed to Lender under the Note
    as modified herein, which has been discharged in bankruptcy.
10. This Agreement shall be construed pursuant to the laws of the
    state in which the property is located.
11. NOTHING CONTAINED HEREIN SHALL BE CONSTRUED TO BE A WAIVER OF THE
    BORROWER'S DISCHARGE, AN ATTEMPT TO COLLECT AGAINST THE BORROWER
    PERSONALLY, OR AN ATTEMPT TO REVIVE PERSONAL LIABILITY.
12. Nothing in this agreement shall be understood or construed to be a
    satisfaction or release in whole or in part of the Security
    Instrument.  Except as otherwise specifically provided in this
    Agreement, the Note and Security Instrument will remain unchanged
    and the Borrower and Lender will be bound by, and comply with, all
    of the terms and provisions thereof, as amended by this Agreement.

_____   7/2/10
John J Schlegel                   /Date

_____   7/2/10
Carol Robin Schlegel              /Date

                    Nedi B. Gulo
              VP of Loan Documentation

TMB 07-07-10
Wells Fargo Bank, N A, Officer/Date

BK011/QS0/4

Wells Fargo Home Mortgage
is a division of Wells Fargo Bank, N.A.